UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SAINATH SINDHE, | : | |
| | : | |
| Plaintiff, | : | 2:21-cv-905 |
| | : | |
| v. | : | |
| | : | |
| HM HEALTH SOLUTIONS, INC., | : | |
| | : | **Electronically Filed** |
| Defendant. | : | |
| | : | **JURY TRIAL DEMANDED** |

**COMPLAINT**

AND NOW, this 13th day of July, 2021, Plaintiff Sainath Sindhe, by and through his undersigned attorneys, files the within Complaint against Defendant HM Health Solutions, and in support thereof avers as follows:

**Jurisdiction and Venue**

1.  This is an action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., the Pennsylvania Human Relations Act, 43 P.S. § 951, *et seq*., and Pennsylvania Common Law.

2.  This Court has subject matter jurisdiction over Plaintiff's Title VII claims pursuant to 28 U.S.C. § 1331.

3.  This Court has supplemental jurisdiction over Plaintiff's related state-law claims pursuant to 28 U.S.C. § 1367.

4.  Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b), because the events giving rise to this claim occurred in this judicial district.

1

## Parties

5. Plaintiff Sainath Sindhe ("Plaintiff" or "Mr. Sindhe") is an adult individual currently residing at 815 Mulberry Court, Wexford, PA 15090. At all times relevant to this Complaint, Plaintiff resided in Allegheny County, Pennsylvania.

6. Defendant HM Health Solutions, Inc. ("Defendant" or "HMHS") is a Pennsylvania business corporation with a regular place of business located at 120 Fifth Avenue, Pittsburgh, PA 15222.

7. HMHS employs more than 15 employees and is a covered employer under both Title VII and the PHRA.

## Exhaustion of Administrative Remedies

8. Sindhe filed a charge of discrimination with the Pittsburgh branch of the Equal Employment Opportunity Commission (EEOC) on or about September 3, 2020.

9. Sindhe's charge of discrimination was dual-filed with the Pennsylvania Human Relations Commission (PHRC).

10. On May 13, 2021, Mr. Sindhe received a Notice of Right to Sue from the EEOC.[1]

## Factual Background

**A. Sindhe worked as a Vice President for HMHS reporting directly to an ever-changing number of supervisors.**

11. Sindhe was hired as HMHS's Vice President of Product Development and Management on or about July 2, 2018.

12. As HMHS's VP of Product Development, Sindhe was responsible for the organization's Claims Department, their Software Application platform.

---

[1] A true and correct copy of Mr. Sindhe's EEOC charge and Notice of Right to Sue is included with this Complaint, collectively, as Exhibit A.

2

13. Sindhe is Indian. He became a naturalized United States Citizen in August 2013.

14. During Sindhe's employment, HMHS underwent significant changes, reorganizations, and layoffs. As a result of these reorganizations, Sindhe's reporting structure changed several times throughout his employment with HMHS.

15. In just over two years, Sindhe had four different direct supervisors at HMHS: Mr. Balajee Sethuraman, Mr. Michael Malec, Ms. Sandra Stefanic, and Ms. Gloria Romeo.

16. Stefanic and Romeo are both white, non-immigrants.

**B. Sindhe uproots his family to move them from Atlanta to Pittsburgh based upon assurances from HMHS COO Michael Malec about Plaintiff's position with HMHS.**

17. For the first several months of his employment, Sindhe worked for HMHS in Pittsburgh, Pennsylvania while his family lived in Atlanta, Georgia.

18. In early 2019, HMHS went through a series of reorganizations and layoffs and his then-supervisor, Mr. Balajee Sethuraman, decided to leave the organization.

19. In April 2019, Sindhe approached his then-supervisor Michael Malec to discuss Sindhe's work performance, job security, and future with the company.

20. In that conversation, Malec assured Sindhe that he was doing well at the company and that he needed Sindhe's help in rebuilding the company following its reorganization.

21. During this discussion, Malec encouraged Sindhe to move his family from Atlanta, Georgia to Pittsburgh, Pennsylvania.

22. At that time, Sindhe and his wife owned a home in Atlanta, where their son was enrolled in middle school.

23. In reliance on Malec's assurance about his job security and his expected retention with the company, Sindhe and his wife planned the move of his family to Pittsburgh in June 2019 after his son finished middle school.

24. Sindhe and his wife sold their home in Atlanta and purchased a home in Pittsburgh to accommodate their family's needs.

25. In April 2019, Sindhe was approached with an offer for a Vice President position with a New Jersey-based life insurance technology platform, SE2.

26. Sindhe turned down this offer for employment following his conversation with Malec about his job security and prior positive job performance reviews from his supervisors.

**C. Sindhe performs satisfactorily under Sandra Stefanic.**

27. In July 2019, HMHS changed Sindhe's direct-report to Ms. Sandra Stefanic.

28. Over the next several months, Sindhe met one-on-one with Stefanic for "check-in" meetings and less formal one-on-one meetings to discuss Sindhe's professional objectives and his team's performance.

29. During these meetings, Stefanic never told Sindhe that his performance was considered "Off-Track," that he had any performance problems, or that he required any sort of performance improvement plan to address deficiencies in his work.

30. While she was his supervisor, Stefanic never provided Sindhe with a verbal or written performance assessment indicating that there were problems with his personal work performance or the performance of his department team members.

**D. Without any prior warning, Gloria Romeo gives Sindhe an "Off-Track" performance rating.**

31. On November 1, 2019, Sindhe's direct-report was changed once more to Ms. Gloria Romeo.

32. Sindhe continued to meet with Romeo, as he had with his previous supervisors, for "check in" meetings and other one-on-one conferences.

4

33. On December 10, 2019, Sindhe and Romeo had their first "check in" meeting to discuss ongoing initiatives and future plans for HMHS.

34. During this meeting, Romeo did not raise any concerns about Sindhe's personal work performance, the work performance of the team of individuals Sindhe led, or any outstanding concerns raised by Sindhe's former supervisors.

35. Over a month later, in Sindhe's annual performance review on January 23, 2020, Romeo informed Sindhe that his work performance for 2019 was considered "Off-Track."

36. During the January 23 meeting, Romeo indicated that Sindhe's "Off-Track" rating was based on input from Sindhe's prior supervisor Sandra Stefanic.

37. Following this meeting, Sindhe sought out Stefanic and asked why she had never mentioned any performance concerns while she was his direct supervisor.

38. Stefanic told Sindhe that she had mentioned some unspecified concerns in the past, but she confirmed that these concerns were never documented while she was his supervisor.

39. Sindhe disagreed with the "Off-Track" rating and told Romeo so, emailing her his and his team's achievements during 2019 and justifying why his performance should not be considered as "Off-Track".

40. On February 13, 2020, Sindhe discussed his disagreement with his "Off-Track" rating with former supervisor Michael Malec. Malec agreed to look into the assessment for Sindhe.

41. Several weeks later, Malec told Sindhe that his "Off-Track" rating would not be changed.

**E. Gloria Romeo places Sindhe on a Corrective Action Plan.**

42. On March 2, 2020, Romeo placed Sindhe on a 30-day Corrective Action Plan ("CAP").

43. While HMHS typically uses CAPs to address recurring deficiencies and periodic supervisor meetings to address specific incidents, the "Areas of Concern" implicated in the CAP include nothing but specific incidents that occurred in 2019, when Sindhe was not reporting to Romeo.

44. Areas of Concern identified in the CAP include:

   a. Minor spelling and grammar mistakes in a draft presentation made by a member of Sindhe's department for a Claims Community of Practice Meeting;

   b. Uncertainty among Sindhe's team members regarding potential restructuring or elimination of the Team Manager role in his department;

   c. References to several unspecified "critical defects" in the Claims platform in 2019; and

   d. An incident from February 12, 2020 regarding the delayed issuance of paper checks and Explanations of Benefits for a Wyoming client.

45. Sindhe's CAP specified that he was to meet with Romeo on a weekly basis to review his progress on the identified CAP goals.

46. While the CAP identified specific incidents that occurred at HMHS in the past, the plan detailed very few objectives about Sindhe's performance going forward beyond vague directives that Sindhe needed to "complete this plan immediately," "demonstrate accountability," and "make improvements."

47. HMHS's CAP did not contain any metrics or objective criteria to measure Sindhe's performance going forward.

**F. HMHS fails to engage in a transparent CAP process.**

48. After Romeo placed Sindhe on his CAP, he sought to meet with her on a weekly basis to discuss his progress on the improvement plan.

49. During the four weeks after Sindhe was placed on a CAP, Romeo met with Sindhe only once in person. In addition, Romeo spoke with Sindhe twice over the phone and in the remaining week did not meet at all for the CAP update meeting.

50. During this time, Sindhe continued to send Romeo regular status reports about his department's performance.

51. Romeo did not respond substantively to these status reports.

52. Neither Romeo nor Nathan Timm, HMHS Senior HR Manager, offered any assistance or mentor Sindhe during the CAP period.

53. Over the four-week CAP period, there were no "critical defects" relating to Sindhe's performance or the performance of the Claims Department.

54. Despite his objectively fair performance during the course of the CAP, in a call with Romeo and Timm, HMHS terminated Sindhe on April 7, 2020.

55. At the time of his termination, Sindhe had completed all possible CAP requirements.

56. Upon information and belief, neither the Areas of Interest identified in Plaintiff's CAP nor his professional accomplishments during the last months of his employment with IHNC resulted in HMHS losing clients.

57. Upon information and belief, while Sindhe was singled out for his alleged performance concerns, other white and/or non-immigrant executives were not disciplined for performance problems that were similar or worse than those incidents identified in Sindhe's CAP.

58. For instance, on multiple days in February 2020, HMHS's Customer Service Call Center experienced unplanned, hours-long shut-downs. Upon information and belief, Mr. Christopher Atkinson, the employee responsible for the call center's service interruptions, was not placed on a CAP because of these failures.

59. Instead, Mr. Atkinson was actually *promoted* to Sindhe's position following his termination.

60. Although African-American employee M.G. Berhe acknowledged to Sindhe that his team was responsible for the service disruption on February 12, 2020 to HMHS's Wyoming client (a disruption which was documented in Plaintiff's CAP as Sindhe's responsibility), Berhe was not disciplined or placed on a CAP because of this issue.

61. Sindhe repeatedly told Romeo that the February 12 incident was caused by Berhe's department and that Berhe had admitted as much.

62. As a result of his termination, Sindhe has suffered and is suffering loss of future salary and benefits.

**G. HMHS's pretextual termination deprives Sindhe of contractual payments.**

63. The terms and conditions of Sindhe's employment with HMHS are outlined in Defendant's written policies and procedures regarding employee bonuses, incentives, and severance payments.

64. Both the provisions regarding the HMHS's Annual Employee Incentive Program and Severance policies applied to Sindhe at the time of his termination.

65. The terms of HMHS's Annual Employee Incentive Program and Severance Package are fully described in Defendant's job offer letter to Sindhe.[2] HMHS's Offer Letter includes the following:

　　a. Sindhe was eligible for an "Annual Employee Incentive Program" that provided an annual bonus to employees, contingent upon the company's achievement of established performance metrics; and

　　b. Sindhe was eligible for up to 12 months of severance in the event that HMHS eliminated his position after 12 months of active employment.

66. Pursuant to HMHS's internal operating policies, if an employee is on a CAP at the end of the year, the employee is ineligible for an annual bonus and pay raise.

67. Thus, as a result of Romeo's "Off-Track" rating, Plaintiff was deprived of his Annual Employee Incentive Program bonus and, upon his termination, contractually-required severance payments.

### Count I: Title VII of the Civil Rights Act of 1964
### Race and/or National Origin Discrimination

68. The averments contained in the preceding paragraphs are incorporated herein as though set forth at length.

69. Title VII of the Civil Rights Act of 1964 prohibits employers from subjecting employees to disparate treatment because of their race and/or national origin. To establish a prima facie case of employment discrimination under Title VII, one must show: "(1) [h]e is a

---

[2] A true and correct copy of HMHS's May 30, 2018 Offer Letter is included with this Complaint as Exhibit B.

member of a protected class; (2) [h]e was qualified for the position he sought to attain or retain; (3) [h]e suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir.2008).

70. Defendant HMHS is a covered employer under Title VII, as it is engaged in an industry affecting commerce and employed more than 15 employees in 2019 and 2020. 42 U.S.C.A. § 2000e.

71. Sindhe was a qualified employee and an immigrant of Indian descent.

72. Defendant HMHS took the following adverse employment actions against Sindhe: giving Sindhe an "Off-Track" rating for his 2019 work performance, placing Sindhe on the March 2020 Corrective Action Plan, failing to meet with Sindhe to regularly discuss his progress on the CAP goals, and terminating Sindhe for pretextual reasons.

73. Defendant HMHS's Corrective Action Plan was objectively unwarranted and based on incidents that were either (1) not tied to the performance of Sindhe or his department, or (2) trifling and disproportionate to the disciplinary measures HMHS employed.

74. HMHS subjected Sindhe to the negative employment actions above because of his race and national origin.

75. Upon information and belief, similarly situated employees who were American and/or white were not subject to negative employment actions by HMHS for the types of incidents identified in Sindhe's CAP.

76. As a result of HMHS's discriminatory employment practices, Sindhe has suffered a significant loss of income, including an Annual Employee Incentive Program bonus and contractually-required severance payments, future salary, and benefits.

WHEREFORE, Sindhe hereby requests that this Honorable Court consider the above and grant relief in his favor. Specifically, Sindhe respectfully requests this Court award Back Pay, Front Pay, Pre-Judgment and Continuing Interest, and any other Compensatory and Punitive damages that this Court sees fit.

**Count II: The Pennsylvania Human Relations Act**
**Race and/or National Origin Discrimination**

77. The averments contained in the preceding paragraphs are incorporated herein as though set forth at length.

78. Defendant HMHS is a covered employer under the PHRA, as it is engaged in an industry affecting commerce and employed more than 4 employees in 2019 and 2020. 43 P.S. § 954.

79. Defendant HMHS took the following adverse employment actions against Sindhe: giving Sindhe an "Off-Track" rating for his 2019 work performance, placing Sindhe on the March 2020 Corrective Action Plan, failing to meet with Sindhe to regularly discuss his progress on the CAP goals, and terminating Sindhe for pretextual reasons.

80. The PHRA's prohibitions on employment discrimination based on race and/or national origin is generally interpreted in accordance with the same claims arising under Title VII. *Dici v. Commonwealth of Pennsylvania*, 91 F.3d 542 (3d. Cir.1996).

81. The PHRA prohibits any employer "because of the race, color, . . . national origin . . . to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required." 43 P.S. § 955.

11

82. Defendant HMHS subjected Sindhe to the negative employment actions above because of his race and national origin.

83. Upon information and belief, similarly situated employees who were American and/or white were not subject to negative employment actions for the types of incidents identified in Sindhe's CAP.

84. As a result of Defendant HMHS's discriminatory employment practices, Sindhe has suffered a significant loss of income, including an Annual Employee Incentive Program bonus and contractually-required severance payments, future salary, and benefits.

WHEREFORE, Sindhe hereby requests that this Honorable Court, in consideration of these facts, award Back Pay, Front Pay, remuneration to account for his lost annual bonus, raise, and severance owed under the terms of Sindhe's employment agreement, Pre-Judgment and Continuing Interest, and any and all other appropriate compensatory and punitive damages that this Court may allow.

## COUNT III: Breach of Contract
## Pennsylvania Common Law

85. The averments contained in the preceding paragraphs are incorporated herein as though set forth at length.

86. Defendant HMHS labeled Sindhe's work performance as "Off-Track" for 2019 without legitimate justification.

87. Despite Sindhe's demonstration that this "Off-Track" rating was unwarranted, the rating remained in place and HMHS placed Sindhe on a Corrective Action Plan.

88. Both the "Off-Track" rating and the Corrective Action Plan were implemented as pretext for Sindhe's termination, as more fully described above.

89. The terms of Defendant's Annual Employee Incentive Program and Severance Package are fully described in Defendant's job offer letter to Plaintiff. Defendant's Offer Letter includes the following provisions:

   a. **"Annual Employee Incentive Program** As a participant in the company's Annual Employee Incentive Program (the AEIP) you may be eligible to receive an annual award, payment of which is contingent upon the company's achievement of established performance metrics as approved by the Board of Directors. If your starting date commences before July 4, 2018, you may be eligible to receive an annual award under the company's 2018 Annual Employee Incentive Program (the AEIP). Such an award is contingent upon the company's achievement of established performance metrics as approved by the Board of Directors. AEIP awards are calculated using only eligible wages received during the applicable plan year and would be paid in March 2019."

   b. **"Severance -** If Highmark Health eliminates your position, you may be eligible for severance under the Severance Plan for Vice Presidents of Highmark. Under the Severance Plan for Vice Presidents, you may be eligible for a maximum of 12 months of severance. Eligibility for this plan begins after 12 months, provided you remain in active employment. "

90. Absent Defendant's unwarranted and pretextual disciplinary actions, Plaintiff would have been entitled to a contractually-mandated Annual Employee Incentive Program bonus, pay raise and, upon his termination without cause, contractually-required severance payments.

91. Defendant HMHS's unwarranted and pretextual disciplinary actions, described more fully above, constitute a breach of their contractual obligations towards Sindhe.

WHEREFORE, Sindhe hereby requests that this Honorable Court, in consideration of these facts, award Sindhe remuneration to account for his lost annual bonus, raise, and severance owed under the terms of Sindhe's employment agreement, and any and all other appropriate consequential damages.

**COUNT IV: Breach of Implied Employment Contract**
**Pennsylvania Common Law**

92. The averments contained in the preceding paragraphs are incorporated herein as though set forth at length.

93. In April 2019, Sindhe expressed hesitation about uprooting and moving his family from Atlanta to Pittsburgh without assurances from his employer that he was going to be retained by HMHS following the company's reorganization.

94. In response to his concerns, Sindhe's then-supervisor Michael Malec assured Sindhe that he was doing well at the company and that he needed Sindhe's help in rebuilding the company following its reorganization.

95. Until January 23, 2020, Sindhe's various direct reports never expressed any concerns about his work performance or the work performance of his team.

96. In addition to the services Sindhe provided to HMHS, Sindhe gave additional consideration when he accepted his Vice President position and decided to remain with HMHS by:

   a. Uprooting and moving his family from their home of over six years and changing his child's school system; and

    b.  Turning down the job offer in April 2019 from New Jersey life insurance technology platform SE2.

97.  Based upon the additional consideration provided by Sindhe, an implied employment contract for a reasonable term was created.

98.  Under such an implied contract, Sindhe could not be fired without cause until the expiration of the reasonable term of employment.

99.  Defendant breached this contract when it terminated Sindhe on April 7, 2020 under dubious claims of alleged performance problems, less than one year after HMHS encouraged Sindhe to complete the move of his family to Pittsburgh.

100.  Defendant breached the implied obligation of good faith and fair dealing within the implied employment contract by capriciously terminating Mr. Sindhe for pretextual reasons.

101.  Defendant had no cause to terminate Sindhe or otherwise breach the implied employment contract.

102.  As a result of Defendant HMHS's discriminatory employment practices, Sindhe has suffered a significant loss of income, in the form of his salary for the remainder of his implied employment contract with HMHS.

WHEREFORE, Sindhe hereby requests that this Honorable Court, in consideration of the above facts, grant relief in his favor and as damages Sindhe's remaining salary under the implied contract.

Date: July 13, 2021

                Respectfully submitted,

                */s/ Marcus B. Schneider*

                Marcus B. Schneider, Esquire
                PA I.D. No. 208421

          Nicholas Pahuta, Esquire
          PA I.D. No. 324355
          STEELE SCHNEIDER
          420 Ft. Duquesne Blvd., Suite 500
          Pittsburgh, PA 15222
          (412) 235-7686
          (412) 235-7693/facsimile
          marcschneider@steeleschneider.com
          nickpahuta@steeleschneider.com

          *Counsel for Plaintiff*